IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PAUL M. PRUSKY, et al.          :        CIVIL ACTION
                                :
        v.                      :
                                :
RELIASTAR LIFE INSURANCE        :
  COMPANY                       :        NO. 07-1335

MEMORANDUM

Dalzell, J.                                August 8, 2007

        In this suit, a sequel to a related case to which we
gave close attention, see Prusky v. ReliaStar Life Ins. Co., 474
F. Supp. 2d 695 (E.D. Pa. 2007) ("Prusky I"); Prusky v. ReliaStar
Life Ins. Co., 474 F. Supp. 2d 703 (E.D. Pa. 2007) ("Prusky II"),
we revisit a topic we would have thought was already pellucidly
clear:  the scope of ReliaStar's contractual duty to execute
trade requests from the Pruskys.  With the sure (if not certain)
hope that this will put the matter to rest, we address
ReliaStar's motion for summary judgment.

I.  **Factual History**

        Paul and Steven Prusky, father and son, are investment
advisors.  Over the past three decades, they have developed
proprietary analysis techniques that allow them to profit from
short-term anomalies in mutual fund pricing due to market
psychology and other factors.  By analyzing pricing models daily
and investing accordingly, they have produced impressive returns

for both their clients and themselves.  Because their strategy focuses on short-term discrepancies between a fund's price (as the fund calculates it daily) and its value, their approach requires them to make frequent, often daily, exchanges of some or all of their investment capital.  This frequent-trading approach is known as "market timing."  Although many mutual fund companies frown upon market timing, see, e.g., Windsor Sec., Inc. v. Hartford Life Ins. Co., 986 F.2d 655, 666 & n.15 (3d Cir. 1993), it is a perfectly legal investment strategy.

In addition to managing funds for their investment clients, the Pruskys manage significant funds of their own through the MFI Associates, Ltd. Profit Sharing Plan (the "Plan").[1]  Paul and Steven Prusky are the sole trustees of the Plan.  In 1998, the Plan bought seven variable life insurance policies from ReliaStar.  These policies permitted the Plan to invest their cash values in the Select*Life Variable Account, a unit investment trust created under the Investment Company Act of 1940.  See 15 U.S.C. § 80a-4.  The Variable Account was divided into a series of mutual fund sub-accounts, allowing the trustees to select from a menu of mutual funds for investment.  The menu

---

[1] At the time the policies in this case were purchased, the Plan was known as the Windsor Securities, Inc. Profit Sharing Plan.

of available funds has changed frequently and significantly as ReliaStar has entered into and/or terminated agreements with fund companies.  At the time this suit was filed, ReliaStar offered sixty-three sub-accounts investing in mutual funds from four fund families:  ING Funds,[2] American Funds, Fidelity, and Neuberger Berman.

When it issued the policies, ReliaStar knew that the Pruskys intended to engage in market timing and would need to make frequent trades in order to execute their strategy. According to its prospectus, the Select*Life Variable Account allows only four sub-account transfers a year.  Because this was clearly inadequate for the Pruskys' purposes, the Plan negotiated an amendment to each of the policies, which was signed in each instance by ReliaStar Vice-President M.C. Peg Sierk.  <u>See</u> Compl., ex. C.  These amendments have been referred to throughout the litigation as the "Sierk Memos."  The Sierk Memos amended the contract between the Plan and ReliaStar to allow the Pruskys to engage in their market timing strategy.[3]

---

[2] ING Funds shares a corporate parent with ReliaStar, so it is perhaps not surprising that fifty-seven of the funds ReliaStar offered at the time of suit are provided by ING.

[3] Because the scope of the Sierk Memos is at the heart of this suit, we will discuss the exact nature of the amendments at length below.

In October of 2003, after receiving inquiries from fund companies about frequent trading activity, ReliaStar restricted the Pruskys from requesting fund transfers electronically, effectively preventing them from executing their investment strategy.  The Pruskys sued and, after protracted litigation that continues, even now, in the Court of Appeals, we found that ReliaStar breached its contract with the Pruskys when it restricted their trading.  We entered an injunction requiring ReliaStar to comply with the terms of the contract as we had construed it.[4]  On January 12, 2007,[5] ReliaStar began processing the Pruskys' faxed trades.  Subsequently, after a hearing, we awarded the Pruskys damages in the amount of $107,293.28.  Prusky II, 474 F. Supp. 2d at 712.  More importantly, in both of these opinions we found that although ReliaStar had contracted to execute the Pruskys' trades, it could "condition its performance

---

[4] Specifically, the injunction required ReliaStar to "to accept and effect sub-account transfer instructions communicated by the owner of the policy by fax, telephone, or other electronic means without limitation as to the number of transfer instructions so long as those transfers are not explicitly barred by a specific condition imposed by the fund in which a sub-account is invested."  Prusky I, 474 F. Supp. 2d at 702.

[5] ReliaStar's delay was occasioned by their confusion over whether, in the absence of an entry of judgment, our order for injunctive relief was immediately effective.  We resolved this issue in our Order of January 12, 2007, after which ReliaStar began processing the Pruskys' trades.

on compliance with [fund company] instructions." <u>Prusky I</u>, 474 F. Supp. 2d at 700; <u>accord</u> <u>Prusky II</u>, 474 F. Supp. 2d at 708 ("ReliaStar [is] entitled to enforce restrictions on the Plan's trading that the funds themselves imposed.").

On February 14, 2007, ReliaStar[6] received a letter from Fidelity Investments requiring ReliaStar, pursuant to the terms of its agreement with Fidelity, to terminate the Pruskys' privilege to purchase[7] shares of Fidelity funds. On February 15, 2007, ReliaStar notified the Pruskys that it was doing so, effective immediately. On March 30 and April 2, 2007, ReliaStar notified the Pruskys of similar restrictions on purchasing ING funds and American funds in response to demands from those companies. That left the Pruskys able to invest in only a single fund: the Neuberger Berman Socially Responsive Fund. In an attempt to mitigate any damages, the Pruskys have placed the cash value of the policies in a money market fund.

On April 4, 2007, the Pruskys filed this lawsuit alleging that ReliaStar was again in breach of its contract. The next day, they filed a motion for a temporary restraining order

---

[6] The letter was actually sent to ING's Chief Compliance Officer, Chad Eslinger.

[7] The Pruskys were still able to redeem shares they had already bought.

requiring ReliaStar to comply with its obligations under the contract,[8] which we denied.

ReliaStar now moves the Court for summary judgment on grounds of <u>res judicata</u> and collateral estoppel or, in the alternative, because no reasonable finder of fact could construe the contract as requiring ReliaStar to effectuate the Pruskys' trades in the face of the demands from the fund companies not to do so.

## II.  **Analysis**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In resolving a motion for summary judgment, the Court must draw all reasonable inferences in the non-movant's favor, <u>Bartnicki v. Vopper</u>, 200 F.3d 109, 114 (3d Cir. 1999), and determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  Where, as here,

---

[8] The Pruskys interpret the contract as requiring ReliaStar to effectuate all of their trades notwithstanding its agreements with the funds not to do so.

the nonmoving party bears the burden of proof at trial, the party
moving for summary judgment may meet its burden by showing that
the evidentiary materials of record, if admissible, would be
insufficient to carry the non-movant's burden of proof at trial.
Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).[9]

A.   Res Judicata

Under Pennsylvania law,[10] "[a]ny final, valid judgment
on the merits by a court of competent jurisdiction precludes any
future suit between the parties or their privies on the same
cause of action."  Turner v. Crawford Square Apartments III, 449
F.3d 542, 548 (3d Cir. 2006) (quoting Balent v. City of
Wilkes-Barre, 669 A.2d 309, 313 (Pa. 1995)).  "For the doctrine
of res judicata to prevail, Pennsylvania courts require that the

---

[9] ReliaStar's first two claims, that the Pruskys' cause
of action is barred by res judicata and/or collateral estoppel,
turn not on questions of fact, but on pure questions of law.
Because we need not consider the factual record to resolve those
questions, those claims may be resolved as a motion for judgment
on the pleadings under Fed. R. Civ. P. 12(c).  We may grant such
a motion if ReliaStar "clearly establishes that no material issue
of fact remains to be resolved and that [it] is entitled to
judgment as a matter of law."  CoreStates Bank, N.A. v. Huls
America, Inc., 176 F.3d 187, 193 (3d Cir. 1999) (internal
quotation omitted).

[10] The parties agree that, because our jurisdiction is
based on diversity of citizenship, we apply the Pennsylvania
jurisprudence regarding res judicata and collateral estoppel.
See Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497,
508-09 (2001).

two actions share the following four conditions:  (1) the thing
sued upon or for; (2) the cause of action; (3) the persons and
parties to the action; and (4) the capacity of the parties to sue
or be sued."  Id. (citing Bearoff v. Bearoff Bros., Inc., 327
A.2d 72, 74 (Pa. 1974)).  There is no question that the parties
here are the same as those in the earlier suit, that their
respective capacities to sue and be sued are unchanged, and that
the earlier suit was litigated to a final judgment on the
merits.[11]  Further, the thing sued upon or for -- namely, the
contract itself -- is also unchanged.  Thus, the only element
that requires close examination is the nature of the Pruskys'
cause of action.

In the absence of a repudiation of the contract, "[a]
judgment in an action for breach of contract does not normally
preclude the plaintiff from thereafter maintaining an action for
breaches of the same contract that consist of failure to render
performance due after commencement of the first action."  Rest.
2d of Judgments § 26, cmt. g (1982).  There is no question that
the breach the Pruskys allege in this action took place after the

---

[11] It is of no import for res judicata purposes that
both parties have appealed our judgment in Prusky II.  See
Shaffer v. Smith, 673 A.2d 872, 874 (Pa. 1996) ("A judgment is
deemed final for purposes of res judicata or collateral estoppel
unless or until it is reversed on appeal.").

conclusion of the prior suit.  On the other hand, res judicata "should not be defeated by minor differences of form, parties or allegations, when these are contrived only to obscure the real purpose -- a second trial on the same cause between the same parties." Helmig v. Rockwell Mfg. Co., 131 A.2d 622, 627 (Pa. 1957) (footnote and emphasis omitted).  Under Pennsylvania law, courts should focus their attention on "whether the ultimate and controlling issues have been decided in a prior proceeding in which the present parties actually had an opportunity to appear and assert their rights." Id.  As our Court of Appeals has analyzed it, "Helmig directs us to brush aside technicalities to uncover the nub of the controversy." Gregory v. Chehi, 843 F.2d 111, 118 (3d Cir. 1988).

Here, although plaintiffs assert a new breach, the "nub of the controversy" is once again the scope of ReliaStar's duty to execute the Plan's requested trades or, put another way, under what conditions ReliaStar may refuse to execute the Pruskys' trades without being liable for breach.  In the previous suit, we addressed that question in some detail, finding that although ReliaStar could not refuse to process trades merely out of a speculative concern that the fund companies would object, it could enforce trading restrictions the funds themselves demanded. See Prusky I, 474 F. Supp. 2d at 700 & n.7; Prusky II, 474 F.

9

Supp. 2d at 708.  That finding necessarily resolves the only significantly contested issue in this case:  whether ReliaStar breached the contract when it failed to effectuate trades that the fund companies had determined violated their trading policies.[12]  Perhaps the strongest indicator that the controlling issues in this suit were conclusively resolved in the earlier litigation is our prior observation, in denying the Pruskys' motion for preliminary relief, that success on the Pruskys' claim "depends upon our vacating or modifying three prior decisions of this Court."  Order of April 5, 2007 at (g).

The Pruskys argue that <u>res</u> <u>judicata</u> is not applicable here because they could not "have litigated in the prior lawsuit a claim that ReliaStar could not ignore the market-timing provision [of the Sierk memos] in response to instructions from mutual funds since, as this Court squarely held, no such instructions had been received as of January 5, 2007, when the Court granted plaintiffs summary judgment."  Pl. Mem. at 15-16 (citing <u>Prusky I</u>, 474 F. Supp. 2d at 700-01).  The argument fails to persuade for two reasons.  First, plaintiffs <u>did</u>, in fact, make such an argument in the earlier lawsuit, one we expressly

---

[12] To the extent that the Pruskys contend, if indeed they do, that the funds made such a determination irregularly or that fund policies did not prohibit their trading, that is not properly before us in a suit between the Pruskys and ReliaStar.

rejected.  See Prusky I, 474 F. Supp. 2d at 700 n.7.  Second,
Helmig does not require that the precise legal claim now at issue
could have been litigated in the earlier suit, so long as the
controlling issues were raised and "the present parties actually
had an opportunity to appear and assert their rights."  Helmig,
131 A.2d at 627.  In the brief in support of their motion for
summary judgment in Prusky I, the Pruskys argued "even if, in the
future, ReliaStar faces an obstacle to performance in the form of
commands from mutual funds to cease accepting trade requests from
plaintiffs, its non-compliance with the contracts would not be
excused."  Prusky I, Pl. Mem. at 17.  The Pruskys went on to
devote nearly four pages of their brief to the very question that
they now claim they could not have litigated in the earlier suit:
what would happen if ReliaStar later received requests from the
funds themselves to restrict the Pruskys' trading.

     Not only did the Pruskys have "an opportunity to appear
and assert their rights," Helmig, 131 A.2d at 627, but we
specifically resolved the issue at the heart of this suit.  We
did so because the scope of the Pruskys' entitlement to
injunctive relief depended on the precise contours of ReliaStar's
obligations.  It was entirely foreseeable -- indeed, inevitable -
- that, after our grant of summary judgment, ReliaStar would face
a situation where a fund demanded that it restrict the Pruskys'

trades.  To account for that eventuality and (we fondly hoped)
foreclose the need for a follow-on lawsuit, we shaped our grant
of injunctive relief to our reading of the contract.  See
Luitweiler v. Northchester Corp., 319 A.2d 899, 902 (Pa. 1974)
("We have held consistently that equitable relief is available to
prevent a multiplicity of lawsuits.").  In sum, in Prusky I the
Pruskys squarely presented to us the controlling issue in this
case and we resolved it conclusively.  It is difficult to imagine
a clearer application of Helmig.

Because the controlling issues in this suit were fully
raised in the earlier suit, and because all the other
requirements are easily met, the Pruskys' suit here is barred by
res judicata.

B.   Collateral Estoppel

ReliaStar also claims that the Pruskys' suit is barred
by the doctrine of collateral estoppel or issue preclusion.  "The
doctrine of collateral estoppel precludes relitigation of an
issue determined in a previous action if:  (1) the issue decided
in the prior case is identical to the one presented in the later
action; (2) there was a final adjudication on the merits; (3) the
party against whom the plea is asserted was a party or in privity
with a party in the prior case; (4) the party or person privy to

12

the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment."  Office of Disciplinary Counsel v. Kiesewetter, 889 A.2d 47, 50-51 (Pa. 2005).

The Pruskys take exception to the application of collateral estoppel in this case for two reasons.  The first is that, whereas our earlier opinions addressed the language in the Select*Life Variable Account prospectus, the parties' agreement is properly memorialized not in the prospectus but in the contract.  This is a classic red herring.  Setting aside the fact that we have already addressed this issue, see Order of April 5, 2007 at 2 n.2, the contract the Pruskys' assert we should focus on in lieu of the prospectus contains language functionally identical to what we have already addressed in the prospectus itself.[13]  Where the language in the two documents is identical, plaintiffs' argument that this distinction implies a difference between the issue raised in this lawsuit and that raised in the earlier suit is without merit.

---

[13] The only difference in the relevant passage is that the prospectus refers to "the Fund" whereas the contract refers to "the mutual fund."  Compare Prusky I, 474 F. Supp. 2d at 700 with Compl., ex. B at 14.  We trust we need expend no effort to justify our conclusion that this technical discrepancy has no effect on our findings regarding the contract language.

13

The Pruskys next make the somewhat more plausible argument that we cannot apply collateral estoppel because the issue was not essential to our judgment in the earlier suit. Certainly, the Pruskys are correct that "[i]f issues are determined but the judgment is not dependent upon the determinations, relitigation of those issues in a subsequent action between the parties is not precluded."  Rest. 2d of Judgments § 27, cmt. h (1982).[14]  The concern is that, because such findings would generally be dicta, they "may not ordinarily be the subject of an appeal by the party against whom they were made."  Id.

In Prusky I plaintiffs sought, in addition to monetary relief, an injunction requiring ReliaStar not only to "perform specifically its obligation under the Contracts to accept and effect sub-account transfer instructions communicated by the owner of the policy by fax, telephone, or other electronic means without limitation as to the number of transfer instructions," Prusky I, Pl. Mot. S.J., Prop. Order ¶ 3, but also to "undertake reasonable efforts to surmount any future obstacle to performance

---

[14] This section of the Restatement, including the comments and illustrations, has regularly been applied by the Pennsylvania Supreme Court.  See, e.g., Pa. State Univ. v. County of Centre, 615 A.2d 303, 306 (Pa. 1992).

of its obligations under the Contracts," id. at ¶ 4.  In order to rule on plaintiffs' motion, therefore, we were obliged to determine whether ReliaStar had a contractual obligation to surmount such obstacles to performance.  We found, at least with regard to requests from fund companies to restrict trading, that ReliaStar had no contractual obligation to negotiate with the funds, or take any other steps to attempt to dissuade the funds from imposing such restrictions, because the contract at issue specifically subjected the Pruskys to them.[15]  See Compl., ex. B at 14.  Consequently, we denied that portion of the Pruskys' requested relief.  Because the Pruskys sought an injunction that would have required ReliaStar to take steps to avoid any restrictions the funds might impose, our determination that ReliaStar had no such obligation was an essential part of our judgment.

The Pruskys claim that, because they were the prevailing party in Prusky I, they would have been barred from

---

[15] It is important to note that our finding was that by enforcing restrictions the funds imposed ReliaStar did not breach the contract.  Had we found that such restrictions excused ReliaStar's performance through impracticability or some other doctrine, ReliaStar would have been required to take reasonable steps to avoid a breach before relying on such an excuse.  Because we found that imposition of such restrictions would not be a breach, ReliaStar has no such duty.  It is, therefore, of no consequence what actions, if any, ReliaStar took in an attempt to dissuade the funds from restricting the Pruskys' trading rights.

appealing our construction of the contract.  They are mistaken.
Though it is true that "[w]hen a court grants the ultimate relief
a party requested . . . it is generally not 'aggrieved' by the
judgment and may not appeal," In re Diet Drugs Prod. Liab.
Litig., 418 F.3d 372, 378 (3d Cir. 2005), in Prusky I we granted
only some of the relief that plaintiffs sought.  Just as the
Pruskys had standing to, and in fact did, appeal our judgment
granting them only some of the monetary relief they sought, they
would have had standing to appeal our judgment to the extent that
it granted only a portion of their requested injunctive relief.
That they declined to take such an appeal does not limit the
preclusive effect of our ruling.

     The Pruskys take an overly simplistic view of issue
preclusion when they argue that "if this Court, in [Prusky I],
had expressed its agreement with plaintiffs on this issue, . . .
it still would have entered summary judgment for plaintiffs."
Pl. Mem. at 19.  As plaintiffs' able counsel is surely aware,
there is more to an entry of judgment than who wins and who
loses.[16]  In this case, while it is true that, if we agreed with

_____

     [16] Again, the Pruskys' current appeal is a perfect
illustration.  Had we found their mitigation strategy adequate,
we would still have entered judgment in their favor.  But no one
could seriously argue that our mitigation determination, see
Prusky II, 474 F. Supp. 2d at 709-12, which is the subject of the
                                        (continued...)

plaintiffs' reading of the contract, we would still have entered judgment for them, we would have ordered substantially different relief.  In particular, the injunction against ReliaStar would have been broader to comport with the commensurately broader reading of their contractual obligations that the Pruskys claimed.  Because our reading of the terms of the contract was dispositive of the question of what injunctive relief the Pruskys' proof of breach warranted, it was an essential part of our judgment.  The Pruskys are, therefore, estopped from relitigating that issue in this forum.

      C.   <u>Breach of Contract</u>

Even were the Pruskys' claims not barred by <u>res judicata</u> and collateral estoppel, we would still grant ReliaStar's motion because it is clear from the contract itself that the Pruskys are not entitled to relief.  In order to avoid any potential dispute as to the applicability of the prospectus to the parties, and because we must take all inferences in favor of the non-moving party, we will assume for purposes of this motion that the entire agreement between the parties consists of the standard form contract, Compl., ex. B, as modified by the

---

[16](...continued)
Pruskys' latest appeal, was not essential to the judgment.

Sierk Memos, Compl., ex. C, and that the terms of the prospectus (to the extent they are not replicated in the standard form contract) do not apply.[17]

"The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties." Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co., 905 A.2d 462, 468 (Pa. 2006). "The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous." Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 390 (Pa. 1986). "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." Kripp v. Kripp, 849 A.2d 1159, 1163 (Pa. 2004). "While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact." Ins. Adjustment Bureau, 905 A.2d at 469.[18]

The contractual issue raised in this case, as in the previous action, is the effect of the Sierk Memos on the

---

[17] Although there are seven policies at issue, the parties agree that each of the contracts is identical.

[18] While the Pruskys are correct that "in determining the intent of the parties, ambiguities are to be construed against . . . the contract drafter," Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd., 739 A.2d 133, 139 (Pa. 1999), because we are addressing the issue on a motion for summary judgment, we can only grant the motion if no ambiguities exist.

agreement between the parties.  We note first that the Sierk
memos make clear that "[a]ny conflict between this document and
any other [ReliaStar] documents shall be resolved in favor of the
language used herein unless otherwise agreed to in writing by all
parties."  Compl., ex. C.  Thus, where the Sierk Memos conflict
with the terms of the standard form contract, the Sierk Memos
control.  Where, however, there is no conflict with the Sierk
Memos, the terms of the standard form contract are still binding
on the parties.

     The first paragraph of each Sierk Memo integrates the
memo with the contract.  The next paragraph allows transfer
requests to be made electronically (where the standard form
contract requires them to be in writing) and as often as once per
day (where the standard form contract only allows four transfers
per year).  It also allows the Pruskys to engage in late
trading[19] and requires ReliaStar to provide some means of
electronic communication on any day the New York Stock Exchange
is open so that it can process transfer requests on the day they
are received.

---

     [19] The Pruskys no longer seek to enforce the late
trading provisions of the contract, which are a clear violation
of 17 C.F.R. 270.22c-1(a).  See Prusky I, 474 F. Supp. 2d at 697
n.3.

The third paragraph, which is at the heart of the claim here, says that ReliaStar "will accept and effectuate all transfers to and from all sub-accounts available to any other SVULI[20] policyholder (without limitation, except as noted herein), with no restriction as to the dollar amount of the transfer." Id. The next sentence allows transfers to be made from one account to several, or from several accounts to several other accounts, again without limitation. The remainder of the paragraph excludes the fixed interest rate account from the amendment and discusses certain technical difficulties that may limit the total number of sub-accounts a policyholder may use during the life of a policy.

The fourth paragraph states that, should ReliaStar institute a transfer fee in the future, the Pruskys will be exempt from that fee.

The Pruskys contend that the "[t]he commitment by ReliaStar that transfers among sub-accounts under the Contracts 'may take place as often as once per day' constituted a waiver of any contrary rights of ReliaStar." Compl. ¶ 44. In essence, then, the complaint is predicated on a claim that ReliaStar agreed to indemnify the Pruskys for any refusal of fund companies

---

[20] SVULI is never defined in the contract, but it clearly refers to the life insurance plan.

to accept trades that ReliaStar forwarded to them.[21]  The only reasonable reading of the Sierk Memos, however, is that ReliaStar agreed to waive the limitations _it_ had placed on investor trading, most importantly the limit of four trades per year.  No reasonable finder of fact could determine that the words "may take place as often as once per day" and "without limitation, except as noted herein" could fairly be read to constitute an indemnification agreement.  Neither does that language expressly or impliedly supersede the provision in the standard form contract that subjects transfers to charges and conditions the funds impose.[22]  Without some more explicit contractual provision, there is no basis for us to determine that the contract requires more of ReliaStar than it has done in this case.[23]

-----

[21] As a technical matter, the funds did not refuse to process trades but instead ordered ReliaStar to stop forwarding trades from the Pruskys.  This is, of course, a distinction without a difference.  The effect on the Pruskys is the same.

[22] The language in the standard form contract reads "All transfers are also subject to any charges and conditions imposed by the mutual fund whose shares are involved."  Compl., ex. B at 14.  Such charges are not, therefore, properly characterized as a right of ReliaStar, but rather as an obligation of the Pruskys under the contract.

[23] The Pruskys claim that, if ReliaStar is unable to process their trades consistent with its fund participation agreements, it should simply credit the policies' cash values
(continued...)

Again, we do not find that its agreements with the funds make ReliaStar's performance impracticable, but rather that the contract itself does not impose on ReliaStar the duties the Pruskys seek to enforce.  There is no conflict between ReliaStar's contract with the Pruskys and its agreements with the funds[24] -- even though those agreements may have been negotiated subsequent to the Sierk Memos -- because nothing in the Sierk Memos requires ReliaStar to negotiate its contracts with mutual funds to accommodate the Pruskys' idiosyncratic investing approach.[25]  Similarly, because ReliaStar has not breached the

_____

[23](...continued)
with the results of the investments the Pruskys were unable to make.  As we noted in Prusky I, "no reasonable finder of fact could determine that, under these conditions, a sophisticated and risk-averse financial institution such as ReliaStar would knowingly enter into an agreement that required it to pay, without qualification, returns on an investment it could not actually make."  474 F. Supp. 2d at 700 n.7.  While certain complex investment vehicles exist to replicate the returns of an investment without actually making an investment in those instruments, that is clearly far beyond the contemplated scope of the agreement between the Pruskys and ReliaStar.

[24] Each of these agreements explicitly requires ReliaStar to "execute" restrictions the fund imposes on investors.  Pl. Mem., exs. F-H.

[25] One can only imagine the chaos that would result if, every time an investment intermediary varied its standard form contract to attract a large investor, it was responsible for ensuring that no subsequent contractual agreement interfered with that investor's particular investment strategy.

22

contract, it has no duty to offer the substitute performance to which the Pruskys claim they are entitled.

Finally, the Pruskys claim that summary judgment should be denied under Fed. R. Civ. P. 56(f) so that they may develop a factual record. Where a contract's terms are clear and unambiguous, "the intent of the parties is to be ascertained from the document itself" without the consideration of external evidence. <u>Ins. Adjustment Bureau</u>, 905 A.2d at 468. Because we find that the terms of the agreement are clear and unambiguous and that, under those terms, ReliaStar's actions are not -- and could not be, regardless of the circumstances under which ReliaStar negotiated its agreements with the funds -- a breach of its agreement with the Pruskys, no further development of the factual record is necessary. The discovery that the Pruskys seek could not have any effect on our ruling here. Nothing we have said relies in any way on the circumstances under which ReliaStar negotiated its contracts with funds, its response to requests from funds to restrict trading, its interactions with funds prior to their requests to restrict trading, or the process by which it decided which funds should be available to its investors. Because nothing in our ruling turns on the issues that are undeveloped in the factual record, denying ReliaStar's motion so

that the Pruskys could investigate further would only result in wasted time and expense for all parties.


                              BY THE COURT:


                              /s/ Stewart Dalzell, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PAUL M. PRUSKY, et al.      :     CIVIL ACTION
                           :
            v.             :
                           :
RELIASTAR LIFE INSURANCE   :
  COMPANY                  :     NO. 07-1335

ORDER

        AND NOW, this 8th day of August, 2007, upon
consideration of defendant's motion for summary judgment (docket
entry # 19), plaintiffs' response (docket entry # 21) and
defendant's reply (docket entry # 23), it is hereby ORDERED that:
        1.   Defendants' motion is GRANTED; and
        2.   The Clerk of Court shall CLOSE this matter
statistically.


                    BY THE COURT:


                    /s/ Stewart Dalzell, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PAUL M. PRUSKY, et al.          :        CIVIL ACTION
                                :
          v.                    :
                                :
RELIASTAR LIFE INSURANCE        :
  COMPANY                       :        NO. 07-1335

JUDGMENT

          AND NOW, this 8th day of August, 2007, in accordance
with the accompanying Memorandum and Order, JUDGMENT IS ENTERED
in favor of defendant ReliaStar Life Insurance Company and
against plaintiffs Paul M. Prusky and Steven G. Prusky.


          BY THE COURT:



          /s/ Stewart Dalzell, J.